NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MARSHALL BERRY,

       Plaintiff,

v.

JOHN LOMBARDI, MORRIS COUNTY
SHERIFF'S DEPARTMENT, EDWARD
ROCHFORD, JOHN DEMPSEY, JOHN
KINNECOM, FRED MILLS, FRANK
CORRENTE, ROGER BISHOP, MICHAEL
NOWACKI, and JOHN DOES I through X,

       Defendants.

Civ. No. 00-2918 (WGB)

O P I N I O N

**APPEARANCES:**

Vincent Paragano, Esq.
PARAGANO & RICHLAN, P.C.
5 Seney Drive
Bernardsville, New Jersey 07924

    Attorneys for Plaintiff

Frank Viola, Esq.
VIOLA, BENEDETTI, AZZOLINI & MORANO, LLC
134 Columbia Turnpike
Florham Park, New Jersey 07932

**BASSLER, SENIOR DISTRICT JUDGE:**

    Plaintiff Marshall Berry ("Berry") allegedly injured his

back as the result of an accident during a training exercise with

his former employer, the Morris County Sheriff's Department

("MCSD").  Years later, Berry took a leave of absence from MCSD

due to the deteriorating condition of his back.  In December

1998, MCSD suspended Berry within two weeks of his resumption of work.  According to Berry, MCSD engaged in improper conduct regarding his disability and race, ultimately resulting in his termination.  As a result, Berry filed this lawsuit against MCSD and various supervisors and co-workers (collectively "Defendants").

The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.  Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391.

Pursuant to Fed. R. Civ. P. 56, Berry has filed a motion for partial summary judgment as to liability only on the claims of discrimination based on disability.  The defendants have moved for summary judgment on all nineteen counts of the Complaint.  Both parties have also filed *in limine* motions seeking to exclude particular evidence.  For the following reasons, the Court **denies** Berry's motion for summary judgment, **grants in part** and **denies in part** Defendants' motion for summary judgment, **denies** Defendants' motions *in limine*, and **denies** Berry's motion *in limine*.

## BACKGROUND

Marshall Berry is an African American male.  (Pl. App. in Opp. to Def. Mot. for Summ. J. ("Pl. Opp. App."), Vol. III, Ex. II, Berry Aff., ¶ 2.)  On May 16, 1977, he began working for the MCSD as a provisional corrections officer in the Morris County Correctional Facility ("Morris County Jail").  (Def. Statement of

2

Material Facts ¶ 1.)  Berry was promoted to the position of corrections sergeant on January 20, 1984.  (Id. ¶ 2.)

Berry injured his back as the result of an accident during an MCSD training exercise on August 3, 1984.  (Id. ¶ 3.)  In March 1997, Berry began experiencing pronounced back pain.  (See id. ¶ 4; Pl. Statement of Undisputed Facts ¶ 9.)  Due to the back pain, Berry was out of work from March 3, 1997 through December 14, 1998.  (Def. Statement of Material Facts ¶ 6.)  During this time, Berry underwent back surgery for a L3-S1 decompression and bone fusion on March 3, 1998.  (Id. ¶ 5.)

On October 12, 1999, Dr. Michael G. Yaffe conducted an independent medical examination of Berry.  (Ltr. from Yaffe to DeJean of 10/12/99.)  Dr. Yaffe concluded that Berry "is able to return to work without limitations except to avoid heavy lifting."  (Id.)

On December 9, 1998, Dr. Carl P. Giordano cleared Berry to return to work "in an unrestricted fashion as a correction's [sic] sergeant," despite noting that Berry "continue[d] to have some back pain and some lower extremity dysesthesias."  (Ltr. from Giordano to Leibu of 12/9/98.)  Berry returned to work as a corrections sergeant on December 14, 1998.  (Def. Statement of Material Facts ¶ 7.)  However, Chief Ralph McGrane of the Morris County Jail allegedly twice saw Berry "hobbling" and "hunched over."  (Pl. App. in Support of Mot. for Partial Summ. J. ("Pl.

3

Moving App."), Ex. I, at 2-3; <u>see also</u> Viola Cert. in Support of Mot. for Summ. J. ("Viola Moving Cert."), Ex. 19, at 0000016.)

Concerned that Berry could not fully perform his job, Michael J. Del Vecchio, Division Head of the Office of Risk Management, wrote Dr. Giordano and asked him to "review the job descriptions [for corrections sergeant and corrections officer] and advise which items you feel Sgt. Berry can perform without endangering himself and/or his fellow officers." (Ltr. from Del Vecchio to Giordano of 12/15/99.) Del Vecchio followed that letter with another in which he enclosed copies of a spinal test performed on Berry. (Ltr. from Del Vecchio to Giordano of 12/17/99.) Del Vecchio remarked that the spinal test indicated Berry "was determined to be borderline in acceptance with the standards set by the U.S. Department of Labor, Employment and Training Administration, Dictionary of Occupational Titles." (<u>Id.</u>) As a result, Del Vecchio concluded that Berry "would be a direct life-safety threat to himself and to his fellow officers should he continue to work as a Corrections Officer and/or Sergeant at the Correctional Facility." (<u>Id.</u>) Although Defendants dispute whether they had played any part in prompting Del Vecchio's correspondence, it is undisputed that Del Vecchio did not notify Berry prior to contacting Dr. Giordano. (Pl. Statement of Undisputed Facts ¶ 19; Def. Opp. to Pl. Mot. for Partial Summ. J. at 4.)

4

In response to Del Vecchio's correspondence, Dr. Giordano acknowledged "that if Mr. Berry were to be in a situation where he has to help restrain an inmate or deal with a combative inmate, that he would be at risk to injuring himself, as well as be at risk for not being capable of helping fellow officers." (Ltr. from Giordano to Del Vecchio of 12/22/99.)  Concluding that Berry was at risk to himself and his fellow officers, Dr. Giordano "discuss[ed] this with Mr. Berry as well and made it clear to him that there is no doubt because of his prior surgery that he is at risk. [He] also made it clear to Mr. Berry that if other work is available to him that does not place him in such direct risk, this would be in his best interest as well." (Id.)

At the end of December 1998, the MCSD suspended Berry from his position as a corrections sergeant pending his final termination.  (Pl. Statement of Undisputed Facts ¶ 20; Def. Statement of Material Facts ¶ 7.)  On May 4, 1999, Berry received a Preliminary Notice of Disciplinary Action seeking his removal as a corrections sergeant.  (Pl. Moving App., Ex. H.)  The MSCD conducted a departmental hearing on September 3, 1999 to determine whether Berry should be removed from his post.  (See id., Ex. I.)  Despite Berry's exemplary work record, Hearing Officer Richard E. Riley recommended Berry's termination:

> This is clearly not a hearing regarding any
> disciplinary infraction.  Unfortunately, this issue is
> Sergeant Berry's inability to perform his duties as a
> Correction's Sergeant.

5

. . .

    Based on the permanency of Sergeant Berry's injuries and the prognosis enumerated in Dr. Giordano's letter of December 12, 1998, I have no other recourse than to recommend to the Sheriff that Sergeant Berry's position with the Sheriff's Office be terminated.
    It is clear from the testimony, the employee's attendance record and the medical information provided to me, as well as the arguments of Counsel, that this employee is not physically capable of fully performing the duties required of a Corrections Sergeant.  It is not clear to me why other remedies for this situation were not pursued.

(Viola Moving Cert., Ex. 19, at 0000017-18.)  On October 4, 1999, the MCSD officially terminated Berry's employment.  (Def. Statement of Material Facts ¶ 10.)

Berry alleges that his termination was racially motivated. Berry alleges that his "race has subjected him to ridicule by many officers and co-workers" at the Morris Count Jail, and that "such ridicule has taken place either in the presence of or with the knowledge of supervisory personnel, including the Defendants."  (Am. Compl. ¶ 25.)  Berry alleges that white officers referred to him with racial slurs and gave him racially derisive nicknames, such as "[Former Sheriff] Fox's Nigger" and "Lips."  (Id. ¶ 27; see also Pl. Opp. App., Vol. III, Ex. RR, Breeding Aff., ¶ 9.)

Berry alleges that the policies and practices of the MCSD and its employees promoted a racially charged atmosphere.  He alleges that white officers constantly referred to African-Americans as "niggers," "jungle bunnies," "spear chuckers," and

"porch monkeys." (Am. Compl. ¶ 31(a); see also Pl. Opp. App.,
Vol. III, Ex. JJ, Dixon Aff., ¶ 5; Ex. NN, Williams Aff., ¶¶ 8-9;
Ex. SS, Moore Aff., ¶ 18.) These racial epithets were allegedly
spoken by high ranking officers Lombardi, Mills, Bishop, and
Nowacki. (See, e.g. Pl. Opp. App., Vol. III, Ex. RR, Breeding
Aff., ¶¶ 7-14.) In addition, white officers allegedly
disseminated and posted racially obscene materials within the
MCSD, including a poster titled "Official Runnin' Nigger Target."
(Am. Compl. ¶ 31(b); see also Pl. Opp. App., Vol. I, Exs. A & B;
Vol. II, Ex. W, Berry Dep., at 155:2-16 (testifying that he
witnessed the target himself).)

White officers at the MCSD were allegedly treated more
favorably than minority officers. (See Am. Compl. ¶ 21.) In
Wiggins v. Morris County Sheriff's Dep't, Civ. No. 96-1336 (JCL),
Brett Williams testified that white officers were promoted more
frequently than minority officers. (See Pl. Opp. App., Vol. II,
Ex. V, Williams Dep., at 106:17-24.) With respect to
disciplining officers, Berry alleges that white officers were
less likely to be punished for rules infractions than minority
officers. (See Pl. Opp. App., Vol. III, Ex. II, Berry Aff., ¶
17A.) For example, in O'Brien v. Morris County Sheriff's Dep't,
Civ. No. 98-236 (JCL), Berry testified that white officers who
shared their food with inmates were not disciplined. (See Pl.
Opp. App., Vol. II, Ex. W, Berry Dep., at 110:20-112:18.) On the

7

other hand, Berry testified that Fred Trottie and Leon Dixon, who are African-American, were terminated for the same conduct. (Id. at 183:8-25.)  Furthermore, Leon Dixon testified that minority officers were treated more harshly than white officers. (Pl. Opp. App., Vol. II, Ex. X, Dixon Aff., at 141:17-22.)  Dixon testified that, among other things, he was given time off for being tardy, whereas a white officer did not receive any punishment for being late to work. (Id. at 143:11-145-24.)

Berry claims that his status as an African-American and association with other minorities played a role in his termination.  Berry further alleges that because he associated with other minority officers, he was subjected to the following punishment: assignment to less-favored posts, assignment to less favored shifts, separation from his friends, and ultimately termination. (Am. Compl. ¶ 29.)  Berry believed the superior officers in the MCSD voiced concern about his back injury because they were afraid he would take favorable posts from white officers if allowed to return to work. (Pl. Opp. App., Vol. III, Ex. II, Berry Aff., ¶ 29.)  The MCSD never offered to place Berry on medical or disability leave as a result of his back injury. (Id. ¶ 25.)  In contrast, the MCSD permitted Noreen Rocco, a white female officer, to take full disability leave for over a year without adverse consequences. (Id. ¶ 34.)  Berry infers that the difference in treatment between himself and Rocco is the

8

product of race.  (<u>See</u> <u>id.</u> ¶ 35.)

On or about December 22, 1999, Berry filed a claim for benefits with the New Jersey Department of Labor and Workforce Development, Division of Workers' Compensation. (<u>Id.</u> ¶ 2 n.2.) On July 15, 2002, the Division of Workers' Compensation approved a settlement award of $26,865.00.  (Viola Moving Cert., Ex. 14.)

Berry filed this action on June 15, 2000 against MCSD, John Lombardi,[1] Edward Rochford, John Dempsey, John Kinnecom, Fred Mills, Frank Corrente, Roger Bishop, and Michael Nowacki.  The nineteen-count complaint contains numerous employment-related causes of action.  Although many claims appear to be repetitive and/or overlap in some ways, the complaint states claims for discrimination based on race and disability, hostile work environment, violation of civil rights under 42 U.S.C. § 1983, intentional infliction of emotional distress, violations of the First Amendment, breach of contract, and breach of implied warranties of good faith and fair dealing.

On October 8, 2004, Berry filed a motion for partial summary judgment as to liability only on his claims for violations of the Americans with Disabilities Act and the New Jersey Law Against Discrimination.  He also filed an *in limine* motion seeking to bar from the trial evidence of the results, settlement, or medical

---

[1] Since then, the parties have stipulated to dismiss with prejudice Defendant John Lombardi from this action.  (Stipulation & Order of Dismissal of 7/11/05.)

reports of his Workers' Compensation case.  On the same date,
Defendants cross-moved for summary judgment on all counts of the
complaint.  Defendants also filed an *in limine* motion seeking to
preclude from the trial any evidence of racial discrimination
that allegedly occurred during Berry's employment with MCSD.

<u>**DISCUSSION**</u>

**I.   Summary Judgment Standard**

Summary judgment will be granted only if the record shows
that "there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 65(c).  Whether a fact is material is determined
by the applicable substantive law.  <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 248 (1986).  An issue involving a material
fact is genuine "if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party."  <u>Healy v. N.Y.
Life Ins. Co.</u>, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), <u>cert.
denied</u> 490 U.S. 1098 (1989).

The moving party has the initial burden of showing that no
genuine issue of material fact exists.  <u>Celotex Corp. v.
Carteret</u>, 477 U.S. 317, 323 (1986).  If the moving party
satisfies this requirement, the burden shifts to the nonmoving
party to present evidence that there is a genuine issue for
trial.  <u>Id.</u> at 324.  The nonmoving party "may not rest upon mere
allegations or denials" of its pleading, Fed. R. Civ. P. 56(e),

10

but must produce sufficient evidence to reasonably support a jury verdict in its favor, Anderson, 477 U.S. at 249, and not just "some metaphysical doubt as to material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility . . . against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983) (citing Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972)); accord Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1077 n.1 (3d Cir. 1996).

## II.  Disability Discrimination

Berry's claims of discrimination based on disability fall into three categories: (1) claims under the Americans with Disabilities Act ("ADA"); (2) claims under the New Jersey Law Against Discrimination ("NJLAD"); and (3) claims under the Rehabilitation Act.

### A.  Americans with Disabilities Act

Counts seven, seventeen, and eighteen state general claims arising under the ADA.  The ADA provides in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

11

42 U.S.C. § 12112(a).[2]  An employer discriminates against a qualified individual with a disability when the employer fails to make reasonable accommodations for a plaintiff's disabilities, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981), the Supreme Court set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment.  This framework applies equally to claims brought under the ADA.  Olson v. Gen. Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996).

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  McDonnell Douglas Corp., 411 U.S. at 802. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Id.  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a

---

[2] Nowhere in their papers do Defendants dispute that the MCSD is a covered entity under the ADA.  Additionally, Berry acknowledges that the ADA applies only to the MCSD and not the individual defendants.

preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination.   Id.

In order to establish a prima facie case of unlawful discrimination, Berry must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  Taylor v. Phoenixville Sch. Dist., 134 F.3d 576, 580 (3d Cir. 1998) (internal citations omitted).

Berry is disabled within the meaning of the ADA.  Berry asserts that the MCSD and Sheriff Rochford considered his back injury to be a "disability" that preventing him from working in the MSCD.  (Pl. Statement of Undisputed Facts ¶ 26.)  Defendants do not dispute this assertion in any of their submissions.[3] Because Berry was "regarded as" having a disability, he has shown that he is disabled within the meaning of the ADA.  See 42 U.S.C. § 12102(2)(C).

---

[3] Defendants also direct the Court's attention to a psychiatry report dated July 30, 1999 indicating Berry suffers from depression.  (Def. Moving Br. at 15.)  Berry, however, never claims that any mental impairment substantially limits a major life activity.  In fact, Berry claims that the psychological trauma occurred after or as the result of his termination and was not the cause of his termination.  (Pl. Opp. Br. at 12.) Therefore, the Court does not consider any argument that Berry's alleged mental impairment is a disability within the meaning of the ADA.

The parties do not dispute that Berry suffered an adverse employment action as a result of his back injury.  Berry's alleged disability prevented him from working in the MCSD.  (Pl. Statement of Undisputed Facts ¶ 26.)  The MCSD suspended Berry from work in December 1998 after contacting his physician and learning that his back injury restricted him from restraining inmates and could threaten the safety of himself and his fellow officers.  (<u>Id.</u> ¶ 20; Pl. Moving App., Ex. B, C, D, H.)  On May 4, 1999, Berry received a Preliminary Notice of Disciplinary Action seeking his removal as a corrections sergeant "due to the lack of progress in [his] disability case and the burden on the workforce of the facility created by [his] absence." (Pl. Moving App., Ex. H, Rider B; Def. Statement of Material Facts ¶ 8.) After a departmental hearing, Berry was removed from his post because his disability prevented him from performing the duties of a corrections officer.  (Pl. Moving App., Ex. J, at 4 & Rider B.)  Clearly, Berry was terminated because of his disability. The question remains, then, whether Berry was otherwise qualified and could have performed the job with a reasonable accommodation.

The second element of making out a prima facie case requires Berry to demonstrate that he is qualified for the job of corrections sergeant, with or without reasonable accommodation. There is a genuine dispute of material fact as to this element.

In order to demonstrate that he is qualified under the ADA,

Berry must show that he "satisfies the requisite skill, experience, education and other job-related requirements of the employment [Berry] holds or desires."  29 C.F.R. § 1630.2(m); see Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 326 (3d Cir. 2003). If Berry makes this showing, he must then establish that, with or without reasonable accommodation, he can perform the essential functions of the job.  42 U.S.C. § 12111(8); Conneen, 334 F.3d at 326; 29 C.F.R. § 1630.2(m).  Defendants do not dispute that Berry has the requisite "skill, experience, education" that his job requires.  However, his back injury restricts Berry from exerting the force necessary to restrain inmates.  (Pl. Moving App., Ex. D.)  Defendants claim that restraining inmates and responding to emergencies are essential functions of being a corrections sergeant.  (Def. Mot. for Summ. J. at 15-16.)  Because no amount of accommodation would enable Berry to effectively restrain inmates, Defendants argue that he is not qualified to perform the essential functions of the job.

"Essential functions" encompass "fundamental" duties of the employment position, not simply "marginal" duties.  29 C.F.R. § 1630.2(n)(1).  Determining whether a particular duty is an essential function is a highly fact-sensitive inquiry, which "'must be made on a case by case basis [based upon] all relevant evidence.'"  Conneen, 334 F.3d at 326 (quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3rd Cir. 1998) (en banc)).

15

"Relevant evidence may include, but is certainly not limited to, the employer's judgment as to which functions are essential and written job descriptions prepared before advertising or interviewing applicants for the job. However, the employee's actual experience is also relevant to the inquiry." Id. (internal citations and quotation marks omitted).

In this case, Defendants assert that the written job descriptions of a corrections sergeant include restraining inmates. Job Specification 32652 lists the following examples of work:

> Maintains order in the building and on the grounds of the institution.
>
> ***
>
> Takes the responsibility for good order and the discipline in specified areas of the institution.
>
> ***
>
> During some investigations is responsible for . . . removing inmates that are a threat to the institution from the general population.

(Viola Moving Cert., Ex. 7, at 0000863.)  The Court notes, however, that these are only three of thirty-six *examples* listed in the document. Moreover, of the requirements listed, only one directly relates to restraining or having any physical contact with the inmates: "Knowledge of approved force techniques, chemical mace, fire fighting equipment and other emergency equipment." (Id. at 0000865.)

16

In addition to the written Job Specifications, Defendants maintain that, under the judgment of the MCSD and Sheriff Rochford, the ability to restrain inmates represents an essential function of being a corrections sergeant.  Sheriff Rochford "considers the physical ability to deal with combative or injured inmates an essential quality of any officer assigned to the jail." (Def. Mot. for Summ. J. at 16.)  In his deposition, Sheriff Rochford testified that having Berry return to work in his current physical condition would pose an undue hardship on the MCSD because there may be "interaction with inmates where he might have to assist a fellow officer or employee if the inmate started acting up or going after an officer." (Viola Cert., Ex. 8, at 67:15-18.)  Sheriff Rochford also stated that the MCSD has no alternative or light duty policy for officers who could not restrain inmates.  (Id. at 66:4-13.)  Defendant Corrente confirmed that, under Sheriff Rochford, light duty does not exist and that medical services requires corrections sergeants to be cleared for full duty prior to beginning work.  (Pl. Moving App., Ex. N, at 102:19-103:15.)

Nevertheless, the actual experiences of Berry (and his co-workers) contradict Job Specification 32652 and the testimony of Defendants Rochford and Corrente.  Berry alleges that numerous positions existed in which officers rarely, if ever, had contact with inmates.  (Pl. Mot. for Partial Summ. J. at 17-18.)  For

17

example, during the period from 1998-2002, the MCSD was in the process of moving into a new facility. (Id.)  The MCSD formed a design team to write policies and procedures regarding the new building.  (Id.)  The design team was comprised of full-time officers at the Morris County Jail. (Bishop Dep., Pl. Moving App., Ex. K, at 51:11-17.)  Working on the design team involved no physical labor, such that the job could have been performed by an individual in a wheelchair. (Id. at 50:13-51:10.)

In addition, the MCSD had a post in the control center of the Morris County Jail.  (Pl. Mot. for Partial Summ. J. at 20; Torkos Dep., Pl. Moving App., Ex. L, at 36:9-14.)  The control center post was one of the least physically demanding posts in the jail.  (Id.)  The control center had to be manned at all times, even when officers needed to respond to a combative inmate.  (See Torkos Dep., Pl. Moving App., Ex. P, at 37:3-7, 38:16-21, 39:14-19.)  Accordingly, a corrections sergeant unable to restrain an inmate could still adequately perform the job.  In fact, the MCSD placed officers with minor injuries in the control center.  (Id. at 37:9-17.)

The positions on the design team and in the control center are but two examples of less strenuous jobs that allegedly could be performed by disabled officers.  Several corrections personnel held posts in the administrative building outside of the secured perimeter of the Morris County Jail.  (Torkos Dep., Pl. Moving

18

App., Ex. P., at 39:20-40:8.)  Even Defendant Corrente had a post outside of the secured perimeter.  (Id. at 40:17-41:16.)  Other administrative positions existed outside of the Morris County Jail.  (See id. at 41:20-42:14.)  In addition, the criteria included in the evaluation forms for many of these posts do not involve the physical preparedness or physical responsiveness of the corrections sergeant.  (See Pl. Moving App., Ex. T.)

From this evidence, a reasonable jury could infer that the posts outside of the secured perimeter did not include restraining inmates.  To the extent that the evidence submitted by Berry contradicts the evidence and testimony of Defendants, the Court finds a genuine issue of material fact as to whether restraining inmates is an essential function of Berry's former job.  Therefore, the Court denies summary judgment to either party on Berry's ADA claims.

**B.   New Jersey Law Against Discrimination**

_____Counts five, seventeen, and eighteen of the complaint allege that Defendants discriminated against Berry on the basis of his disability, in violation of the New Jersey Law Against Discrimination.  N.J.S.A. 10:5-4.1 prohibits employers from engaging in unlawful employment practices or discrimination against any disabled person, "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment."  N.J.S.A. 10:5-4.1; Morris v. Siemens Components,

19

Inc., 928 F. Supp. 486, 495 (D.N.J. 1996); Kube v. New Penn Motor
Express, Inc., 865 F. Supp. 221, 228 (D.N.J. 1994).

The standard for analyzing an NJLAD claim in the summary
judgment context is the same as that applicable to claims of
discrimination under federal statutes.  Lawrence v. Nat'l
Westminster Bank N.J., 98 F.3d 61, 70 (3d Cir. 1996); Abrams v.
Lightolier, 50 F.3d 1204, 1212 (3d Cir. 1995).

The sequence of proof and burdens prescribed for Title VII
claims by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05
(1973), and Texas Department of Community Affairs v. Burdine, 450
U.S. 248, 252-56 (1981), applies to LAD claims as well.  Olson v.
General Elec. Aerospace, 101 F.3d 947, 951, 956 (3d Cir. 1996)
(ADA and NJLAD); see also Abrams, 50 F.3d at 1212 ("New Jersey
courts in applying the NJLAD generally follow the standards of
proof applicable under the federal discrimination statutes.");
Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993) ("In
construing the terms of the LAD, this Court has frequently looked
to federal precedent governing Title VII . . . as 'a key source
of interpretive authority.'") (quoting Grigoletti v. Ortho Pharm.
Corp., 118 N.J. 89, 97 (1990)).

The plaintiff first bears the burden by a preponderance of
the evidence of proving a prima facie case of discrimination.
McDonnell Douglas Corp., 411 U.S. at 802.  To establish a prima
facie case of discriminatory discharge under the NJLAD, a

20

plaintiff must demonstrate:

> (1) that he or she was handicapped within the meaning
> of the law, (2) that he or she was performing his or
> her job at a level that met his employer's legitimate
> expectations and that the handicap did not unreasonably
> hinder his or her job performance, (3) that he or she
> nevertheless was fired, and (4) that the employer
> sought someone to perform the same work after he or she
> left.

Morris, 928 F. Supp. at 495; Kube, 865 F. Supp. at 228; Jansen v.
Food Circus Supermarkets, Inc., 110 N.J. 363, 382, 541 A.2d 682,
692 (1988).  In this case, Berry has not alleged or even offered
any proof that the MCSD has sought someone to perform his job
after he was terminated.  Therefore, Berry has failed to meet his
burden of making out a prima facie case of discriminatory
discharge.

Nevertheless, the Court recognizes that the standard for
proving a discriminatory discharge claim under the NJLAD is
premised on a theory of disparate treatment.  See Seiden v.
Marina Assocs., 315 N.J. Super. 451, 459-60 (Law Div. 1998).  In
a case such as this one, the plaintiff's claim is premised on an
alleged failure by the employer to accommodate the employee.  See
id. at 460.  The fourth element in the standard for a
discriminatory discharge claim, in which the court compares the
treatment of the plaintiff to that of other employees, is
unnecessary.  See id. at 460.  "When an otherwise qualified
handicapped employee is not reasonably accommodated and suffers
an adverse employment action because of his or her disability,

21

that, in itself, is sufficient from which to infer discrimination." Id. at 460-61.

Although the New Jersey Supreme Court has not yet addressed the issue, lower courts within New Jersey have applied the following standard to NJLAD claims based upon a failure to accommodate:

> Generally, a prima facie case of failure to accommodate requires proof that (1) the plaintiff had a LAD handicap; (2) was qualified to perform the essential functions of the job, with or without accommodation; and (3) suffered an adverse employment action because of the handicap.

Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 91 (App. Div. 2001) (citing Seiden, 315 N.J. Super. at 455-56); see also Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 150 (3d Cir. 2004) (citing to Bosshard for failure to accommodate standard); Dicino v. Aetna U.S. Healthcare, Civ. No. 01-3206(JBS), 2003 U.S. Dist. LEXIS 26487, at *38 (D.N.J. 2003) (unpublished) (citing to Bosshard).

Because the standard for proving a claim under the NJLAD for failure to accommodate is virtually identical to the standard for proving a claim under the ADA, the analysis is also the same. Therefore, for the reasons stated above, the Court denies summary judgment to both parties on counts five, seventeen, and eighteen.

## C. Rehabilitation Act

Counts seventeen and eighteen of the complaint include claims of disability discrimination pursuant to the

Rehabilitation Act, 29 U.S.C. § 701 et seq.  The rights and
remedies under the Rehabilitation Act are the same as with the
ADA.  McDonald v. Pa. Dep't of Public Welfare, Polk Center, 62
F.3d 92, 94-95 (3d Cir. 1995).  "[I]dentical standards [are] to
be applied to both Acts."  Id. at 94.  Berry re-alleges the same
facts to support his Rehabilitation Act claims against
Defendants.  For the same reasons stated above, a genuine issue
of material fact exists as to whether restraining combative
inmates is an essential function of the job of a corrections
sergeant.  Because this dispute must be resolved to determine
whether Berry sets forth a prima facie case of disability
discrimination, the Court denies summary judgment to both parties
on this issue.

D.   **Breach of Contract**

Count fifteen of the complaint states a common law claim for
breach of contract, and count sixteen states a claim for breach
of the implied duties of good faith and fair dealing.  In count
fifteen, Berry alleges the standard operating procedures,
operations manuals, employee manuals, and other related policies
of the MCSD created an implied contract between him and the MCSD,
which was breached when Defendants allegedly discriminated
against him based on his disability.  (See Am. Compl. ¶¶ 125-27.)
Making the same allegations in count sixteen, Berry claims that,
based upon those acts, the MCSD also breached the implied

warranties of good faith and fair dealing.  (<u>See</u> Am. Compl. ¶¶ 129-31.)

In the "Summary and Conclusion" of Defendants' Brief in Support of Motion for Summary Judgment, the MCSD asserts that counts fifteen and sixteen of the complaint are "ripe for dismissal." (Def. Mot. for Summ. J. at 28.)  However, the MCSD does not provide any support this assertion.  Berry does not respond to this assertion in any of his briefs to the Court. Nevertheless, the Court will grant summary judgment to the MCSD on these counts.

In reaching this conclusion, the Court is persuaded by the rationale in <u>Santiago v. City of Vineland</u>, 107 F. Supp. 2d 512 (D.N.J. 2000) (Orlofsky, J.).  In <u>Santiago</u>, the plaintiff, a municipal special law enforcement officer, sued his employer alleging discrimination on the basis of race and disability.  107 F. Supp. 2d at 526.  In addition to claims brought under Title VII and the ADA, the plaintiff brought common law claims for breach of contract and tortious interference of a contractual relationship.  <u>Id.</u>  According to the plaintiff, an alleged official non-discrimination policy of his employer created an implied contract, which was breached by the employer's discriminatory acts against him.  <u>Id.</u> at 566.  The district court granted summary judgment in favor of the defendants.  <u>Id.</u> at 568.

The court noted that New Jersey law provides a cause of

action for wrongful discharge when "'the discharge is contrary to a clear mandate of public policy.'" Id. at 567 (quoting Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980)).  Common law claims for wrongful discharge, however, are preempted when a statutory remedy under the NJLAD exists.  Id. (citing, among others, Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 73 (3d Cir. 1996)).  The court went on to state that it "discovered one New Jersey published opinion that extends the argument to duplicative contract claims."  Id. (citing DeCapra v. Bell Atlantic-N.J., Inc., 313 N.J. Super. 110, 127-28 (Law Div. 1998) (finding that employee's NJLAD claim barred duplicative breach of contract claim, where contract claim was based upon harassment policy)).

Applying that logic, the court found that the plaintiff's common law contract-based claims sought to vindicate the same rights as those recognized by the NJLAD.  Id. at 568.  For that reason, the court granted summary judgment to the defendants on the contract claims.  Id.  This case is analogous to Santiago. By making claims for breach of contract and breach of certain implied warranties, Berry seeks relief from the alleged discriminatory acts committed by the MCSD.  These rights, however, are recognized by the NJLAD.  Because Berry has stated a claim for relief under the NJLAD, the Court finds his common law claims to be duplicative.  Therefore, the Court grants summary judgment to the MCSD on counts fifteen and sixteen.

25

**E.   Judicial Estoppel**

Defendants assert that Berry's disability claims directly conflict with the positions he took in his Workers' Compensation case. (Def. Mot. for Summ. J. at 18.) Defendants argue that the doctrine of judicial estoppel should limit or dismiss Berry's claims "insofar as they conflict with the position he adopted in his Workers' Compensation case." (Id. at 19.)

The Court may invoke judicial estoppel at its discretion "'to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions, and . . . with a recognition that each case must be decided upon its own particular facts and circumstances.'" Motley v. N.J. State Police, 196 F.3d 160, 163 (3d Cir. 1999) (quoting McNemar v. Disney Store, 91 F.3d 610, 617 (3d Cir. 1996)).

In Cleveland v. Policy Management Systems Corp., 526 U.S. 795 (1999), the Supreme Court analyzed whether the pursuit and receipt of Social Security Disability Insurance ("SSDI") benefits automatically estops the recipient from pursuing a claim under the ADA. The Supreme Court recognized that a person might qualify for disability benefits under the Social Security Act yet remain capable of performing the functions of his job with a reasonable accommodation under the ADA. See id. at 803. Because the two claims can coexist, the Court concluded that courts

26

should not apply a *per se* rule that a claim for disability bars
an individual from pursuing an ADA claim.  See id.  Nonetheless,
the Court noted that an ADA plaintiff cannot ignore the
inconsistencies inherent in the two actions.  Id. at 806.  In
order to survive a motion for summary judgment, the plaintiff
"must explain why that SSDI contention is consistent with her ADA
claim that she could 'perform the essential functions' of her
previous job, at least with 'reasonable accommodation.'"  Id. at
798.

In the Third Circuit, the district court is to make two
threshold determinations before applying judicial estoppel: (1)
whether the present position is inconsistent with a position
asserted in another proceeding; and (2) if so, whether either or
both inconsistent positions were asserted in bad faith with the
intent to play "fast and loose with the court."  Motley, 196 F.3d
at 163-64 (citing Ryan Operations G.P. v. Santiam-Midwest Lumber
Co., 81 F.3d 355, 361 (3d Cir. 1996)).

Berry has submitted enough evidence that the positions taken
in this litigation are not inconsistent with those taken in his
Workers' Compensation case.  First, Berry only sought "unpaid
*temporary* disability benefits," which bolsters his assertion in
this case that he can now perform the work of a corrections
sergeant.  (See Viola Moving Cert., Ex. 1, Berry Cert., ¶ 28.)
Second, during the Workers' Compensation hearing, Berry states

27

that he has problems lifting and doing other activities, but he never states that he cannot perform his job without accommodation.  (Viola Moving Cert., Ex. 13, at 7:10-9:8.) Third, the settlement reached by Berry and the MCSD concluded that Berry was 27.5% permanently partially disabled.  (Id. at 3:25-4:1.)  Even if Berry is permanently partially disabled, he may be able to do the work of a corrections sergeant with some reasonable accommodation.  In fact, if Berry is correct that restraining inmates is not an essential function of the job, he may be able to do the work without any accommodation.  See Cleveland, 526 U.S. at 804 ("an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'performing the essential functions' of her job").  As Berry has demonstrated that his positions are not inconsistent, the Court will not apply judicial estoppel to bar his claims under the ADA.

**III. Race Discrimination**

The majority of Berry's complaint rests on allegations of discrimination on the basis of race.  He puts forth various theories of liability, premised upon violations of Title VII of the Civil Rights Act of 1964 and the NJLAD.  The Court will discuss each theory in turn.

A.   **Disparate Treatment**

1.   **Title VII**

Counts three, eleven, twelve, and nineteen of the complaint state claims for intentional discrimination based on race in violation of Title VII.  Therefore, the Court will apply the burden-shifting framework of McDonnell Douglas and Burdine, as set forth in Part II(A), *supra*.

Under the McDonnell Douglas/Burdine model, a discharged employee must first prove a prima facie case of discrimination. Burdine, 450 U.S. at 252-53; Abramson v. William Paterson College, 260 F.3d 265, 281-82 (3d Cir. 2001) (citations omitted). To prove a prima facie case of discriminatory discharge based upon race, a plaintiff must prove that (1) he is a member of a protected class; (2) he is qualified to do the job; (3) despite these qualifications, he was the subject of an adverse employment action; and (4) "under circumstances that raise an inference of discrimination, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position."  Sarullo v. United States Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003); cf. Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) ("plaintiff must generally present evidence that 'raises an inference of discrimination'") (citations omitted).

Berry has satisfied the first, third, and fourth elements of

29

a prima facie case.  As an African-American he is a member of a
protected class.  The MCSD subjected Berry to an adverse
employment action when it terminated him on October 4, 1999.
Finally, as detailed above, Berry has submitted evidence that he
worked in a racially charged atmosphere.  That work environment
and the circumstances surrounding his termination give rise to an
inference of discrimination based upon race.

Nonetheless, the Court finds that a genuine issue of
material fact exists as to whether Berry is qualified to do the
job of corrections sergeant.  As stated in Part II(A)(2), *supra*,
the parties disagree whether restraining inmates is an essential
function of the job.  Defendants argue that Berry must be able to
restrain inmates in emergencies.  Because his back injury
prevents him from doing so, Defendants claim that Berry is not
qualified for the job.  On the other hand, Berry argues that
physically restraining inmates is not an essential function.
Because he can perform the other duties of corrections sergeants,
Berry argues that he is qualified for the job.  Essentially, the
parties have different interpretations as to what "qualified"
means in this case.  Therefore, a genuine issue of material fact
exists as to whether Berry is qualified for the job.
Accordingly, the Court denies summary judgment to the MCSD on the
Title VII claims in counts three, eleven, twelve, and nineteen of

the complaint.[4]

### 2.   NJLAD

In addition to stating disparate treatment claims under Title VII, counts three, eleven, twelve, and nineteen also state disparate treatment claims under the NJLAD.  To prove a prima facie case of disparate treatment under the NJLAD, a plaintiff must demonstrate that he or she "(1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and (4) the employer sought to, or did fill the position with a similarly-qualified person." Gerety v. Atlantic City Hilton Casino Resort, 2005 N.J. LEXIS 931, at * 19 (N.J. July 25, 2005).  This is essentially the same test applied by federal courts under Title VII.  In fact, the New Jersey Supreme Court has "looked to 'the substantive and procedural standards established under federal law' for general guidance" in deciding employment discrimination claims brought under the NJLAD.  Id. (citing Viscik v. Fowler Equip. Co., 173 N.J. 1, 13, 800 A.2d 826 (2002)).  Because the substantive and procedural standards are the same, the analysis above applies equally to Berry's disparate treatment claims under the NJLAD.  Therefore, the Court denies

---

[4] Berry concedes that the individual defendants cannot be held liable for race discrimination under Title VII.  However, Berry attempts to hold them liable under the NJLAD as aiders and abettors, pursuant to N.J.S.A. 10:5-12(e).  The Court addresses these claims in Part III(), infra.

summary judgment to the MCSD on counts three, eleven, twelve, and nineteen to the extent that they involve claims under the NJLAD.

### B.   Hostile Work Environment

#### 1.   Title VII

Count eight states a claim of hostile work environment in violation of Title VII.  A court will find a hostile work environment if the plaintiff proves:

> (1)he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability.

Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); see West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995).  Looking to all the circumstances, Plaintiff must be able to demonstrate that the harassment was so severe or pervasive as to create an *objectively* hostile work environment.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Based on the evidence, a reasonable jury could conclude that the working environment at the MCSD was pervaded by "discriminatory intimidation, ridicule, and insult."  Harris, 510 U.S. at 21.  There is adequate support in the record that Berry and other minority officers were repeatedly called racial slurs. Defendants Mills, Bishop, and Nowacki and former defendant

Lombardi are alleged to have spoken the epithets, and Lombardi
and Mills labeled Berry "Fox's educated Nigger."  In addition to
the use of ethnic slurs by MCSD employees and supervisors,
racially offensive posters were displayed in the workplace.
Moreover, there is evidence in the record to suggest that
Defendants disciplined minority officers more harshly than white
officers.  Berry himself was terminated, whereas similarly
situated employees were allegedly accommodated or given full
disability benefits upon retirement.  Particularly with evidence
that supervisors participated in the discriminatory conduct,
Berry has produced sufficient evidence to have his claim of
hostile work environment decided by a jury.

    Defendants present two arguments that Berry did not suffer
from a hostile work environment.  First, Defendants point to
Berry's testimony that he has no knowledge of the individual
defendants discriminating against him on the basis of race.  The
Court is mindful that when questioned at his deposition, Berry
testified that he did not suffer direct discrimination from most
of the individual defendants.[5]  (See Viola Moving Cert., Ex. 2,

_____

    [5] For example, the following exchange took place at Berry's
deposition on October 8, 2002:
    Q:   Did Mr. Corrente engage in any practices of
         employment discrimination?
    A:   Directly that affected me?
    Q:   Yes.
    A:   Not to my knowledge, no.
(Viola Moving Cert., Ex. 2, 10/8/02 Berry Dep., at 48:20-24.)

33

10/8/02 Berry Dep., at 48:20-24, 92:15-19, 97:21-24; 10/18/02 Berry Dep., at 184:23-185:1.)  Despite these admissions, Berry also testified that Defendant Bishop instructed Berry to keep quiet about his concerns of discrimination within the MCSD.  (See Viola Moving Cert., Ex. 2, 10/8/02 Berry Dep., at 60:8-64:1.) Berry felt any complaints would jeopardize his career.  (See id.) In addition, Berry heard Defendants Mills, Bishop, and Nowacki utter racial epithets.  (Id. at 190:3-23.)  These inconsistencies in testimony go to Berry's credibility, which should be evaluated by a jury.

Second, Defendants argue that because he rarely heard racial comments firsthand, there can be no hostile work environment. Berry testified to overhearing racial slurs spoken by others, including some of the individual defendants.  (See 10/18/02 Berry Dep., at 37:16-23, 190:3-23.)  More often, however, Berry testified that he heard discriminatory comments second-hand from other officers.  (See, e.g., id. at 189:10-190:2.)  Nonetheless, the Court must look at all of the circumstances surrounding Berry's claim.  See Harris, 510 U.S. at 23.  The circumstances "may include the frequency of the discriminatory conduct," id., which should not be limited to the conduct that Berry witnessed or heard firsthand.

Based on the record before it, the Court concludes that Berry's Title VII claims for hostile work environment should

proceed to a jury trial.  Discrimination still exists in today's society, although it often takes on subtle forms.  Therefore, the Court takes Berry's allegations seriously, even those that stem from second-hand accounts provided by fellow officers.  As the Third Circuit Court of Appeals has stated, "violators have learned not to leave the proverbial 'smoking gun' behind. . . . '[D]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (quoting Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987)).  With this in mind, the Court concludes that a jury should properly evaluate the credibility of Berry's allegations of discrimination - some of which are subtle, and some of which are overt.  The Court therefore denies both parties' motions for summary judgment on count eight, insofar that count eight states a claim under Title VII.

In making this ruling, the Court acknowledges the recent decision in Caver v. City of Trenton, No. 04-2600 (3d Cir. Aug. 26, 2005), in which the Third Circuit Court of Appeals affirmed the district court's judgment in favor of the employer.  In that case, appellant Lawrence Davis brought various federal and New Jersey state law claims against his employer, the City of Trenton, alleging, among other things, hostile work environment. Caver, slip op. at 4.  During a jury trial, Davis testified that

35

he overheard other officers use racial slurs to describe other
African-American officers.  Id. at 5-6.  In addition, he
described racist graffiti and flyers posted at headquarters of
the Trenton Police Department.  Id. at 6.  He also claimed that
certain facially neutral conduct by the City was racially
motivated.  Id. at 34-35.

The Third Circuit Court of Appeals noted that no racist
comment was ever directed at Davis himself, nor did Davis ever
personally see any racist graffiti or flyers at the Department.
Id. at 35.  The court therefore concluded that "Davis cannot meet
the first element of the hostile work environment claim under
Title VII or the LAD - causation - *solely* by pointing to comments
that were directed at other individuals."  Id. (emphasis in
original).  Furthermore, the racists comments he heard about
other officers could only be considered "the sorts of 'offhanded
comments and isolated incidents'" that the Supreme Court in
Faragher, 524 U.S. at 788, cautioned should not be considered
severe or pervasive enough to constitute a hostile work
environment."  Id.

Because these incidents alone were insufficient to make out
a hostile work environment claim, the Third Circuit Court of
Appeals also reviewed the circumstances surrounding the facially
neutral conduct Davis claimed to be racially motivated.  With
respect to that conduct, the jury found that Davis failed to

establish the actions were motivated by racial considerations.
Id. at 37.  Because the jury "conclusively determined that the
actions toward Davis were not racially motivated," the court
concluded that the finding was fatal to the hostile work
environment claim.  Id. at 39.  The Third Circuit Court of
Appeals therefore affirmed the judgment in favor of the City on
the hostile work environment claim.   Id.

     Recognizing the similarities between this case and Caver,
the Court nonetheless feels that summary judgment is not
appropriate at this time.  Although most of Berry's allegations
concern second-hand information, there is evidence that officers
directed at least some of the racist slurs and/or comments at
him.  There is also evidence that Berry personally saw racially
insensitive posters, specifically the "Official Runnin' Nigger
Target."  Finally, in Caver the jury heard the evidence and
determined that the facially neutral conduct engaged in by the
employer was not racially motivated.  In this case, the MCSD
offers a facially neutral explanation for Berry's termination:
Berry could no longer perform his job due to his back problems.
Given the circumstances surrounding his termination, however,
Berry should not be deprived of the opportunity to demonstrate to
a jury that the MCSD's explanation is pretextual and in fact
racially motivated.  The differences between Caver and this case,
particularly their procedural histories, compel this Court to

deny summary judgment and let Berry's hostile work environment claims proceed to trial.

### 2.   NJLAD

Count eight also alleges a hostile work environment claim pursuant to the NJLAD.  Under the NJLAD, a plaintiff alleging a hostile work environment "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive."  Taylor v. Metzger, 152 N.J. 490, 498, 706 A.2d 685, 688-89 (1998) (quotations omitted).  The New Jersey Supreme Court requires a cumulative analysis of the facts surrounding a hostile work environment.  See Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 607, 626 A.2d 445, 455 (1993).  Because the prima facie case and the analysis undertaken by the trial court so closely resemble those of a hostile work environment claim brought under Title VII, the above discussion applies equally to Berry's NJLAD claim for hostile work environment. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). Consequently, Berry has provided sufficient evidence of a hostile work environment to survive summary judgment.  The Court denies both parties' motions for summary judgment with respect to count eight of the complaint to the extent it states an NJLAD claim.

38

### C.   Systemic Disparate Treatment (Pattern or Practice)

Alleging a "pattern and practice of racial discrimination/ harassment," Berry attempts to make out a systemic disparate treatment claim under the NJLAD.  (Am. Compl. ¶ 51.)  The New Jersey Supreme Court has not addressed how a plaintiff establishes a prima facie case of systemic disparate treatment. Because New Jersey courts regularly turn to federal standards in applying the NJLAD, the Court will apply federal case law construing Title VII.

The United States Supreme Court has held that a plaintiff must establish by a preponderance of the evidence that the class discrimination was the employer's "standard operating procedure-- the regular rather than the usual practice." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977).  In other words, the plaintiff must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." Id. "One of the most widely used and effective means of establishing a pattern or practice of discrimination is by the use of statistics." Presseisen v. Swarthmore College, 442 F. Supp. 593, 599 (E.D. Pa. 1977).

In this case, Berry offers no statistical evidence of a pattern or practice of discrimination.  The only proof offered is anecdotal evidence of discrimination against various individuals. Berry never states whether the individuals who allegedly suffered

39

discrimination constituted all, a majority, or a minority of the officers at the MCSD or whether all, a majority, or a minority of the African-American and Hispanic officers suffered discrimination.  Nor does Berry provide a time line of events to aid the Court in determining how often these acts occurred. Without more, the Court cannot determine whether these allegedly discriminatory acts were isolated, accidental, and sporadic, or whether they were the regular practice of Defendants.

Berry has failed to make out a claim of systemic disparate treatment by a preponderance of the evidence.[6]  As he has not met his burden, the Court grants summary judgment to Defendants on count two of the complaint.

### D.    Aiding and Abetting Under N.J.S.A. 10:5-12(e)

Conceding that the individual defendants cannot be held liable for race discrimination under Title VII, Berry nonetheless wishes to hold them liable under the NJLAD.  N.J.S.A. 10:5-12(e) makes it an unlawful employment practice "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NJLAD], or to attempt to do so."  Berry claims that the individual defendants are liable as aiders and abetters because they "are all supervisory employees who committed affirmative

---

[6] Of course, in no way does this conclusion diminish Berry's own claims of disparate treatment and hostile work environment.

acts of discrimination and/or displayed deliberate indifference to workplace discrimination."

Indeed, under this theory of liability, a supervisor has a duty to act against harassment. Hurley v. Atlantic City Police Department, 174 F.3d 95, 126 (3d Cir. 1999) (citing Taylor v. Metzger, 152 N.J. 490, 502, 706 A.2d 685, 691 (1998)). A supervisor violates this duty either through deliberate indifference or affirmatively harassing acts. Id. (citing F. Judson v. Peoples Bank & Trust Co., 26 N.J. 17, 134 A.2d 761 (1957)). Therefore, liability can arise from an individual's inaction "if it rises to the level of substantial assistance or encouragement." Failla v. County of Passaic, 146 F.3d 149, 158 n.11 (3d Cir. 1998) (citing DICA v. Pennsylvania, 91 F.3d 542, 553 (3d Cir. 1996)).

Berry has not provided sufficient evidence to survive the summary judgment motions by Edward Rochford, John Dempsey, John Kinnecom, Frank Corrente, or Michael Nowacki. When asked at his deposition whether Sheriff Rochford discriminated against him as an individual, Berry answered, "Not to my knowledge." (Viola Moving Cert., Ex. 2, 10/8/02 Berry Dep., at 92:15-19.) Berry could not point to any acts of racial discrimination by Dempsey, and he further admitted that Dempsey never discriminated against him based on race. (Id. at 97:21-24, 99:8-10.) He stated that Nowacki never engaged in racial discrimination against him.

41

(Viola Moving Cert., Ex. 2, 10/18/02 Berry Dep., at 184:23-185:1.)  Berry has never alleged that Kinnecom and Corrente directed any racial animus at him.  Furthermore, in a previous action Berry testified that he never told anyone that other officers complained to him about the use of racial slurs in the workplace.  (Viola Moving Cert., Ex. 2, 9/3/98 Berry Dep., at 83:13-18.)  In fact, Berry never alleges that he filed a report or told anyone about race discrimination at the MCSD.  Based on these facts, Berry cannot prevail as a matter of law on his NJLAD claims against Rochford, Dempsey, Kinnecom, Corrente, or Nowacki.

Berry may, however, be able to prove that the actions or inaction of Fred Mills and Roger Bishop rose "to the level of substantial assistance or encouragement."  Failla, 146 F.3d at 158 n.11 (3d Cir. 1998).  Berry claims Mills referred to him as "Fox's educated nigger."  (Pl. Opp. App., Vol. III, Ex. RR, Breeding Aff., ¶ 9.)  Mills also used other racial epithets at the workplace.  (See id. ¶ 10.)  The evidence suggests Mills not only knew of the racially charged atmosphere and failed to act against it, but he may have been a part of the discrimination and harassment.

The same can be said for Bishop.  Berry has presented evidence that Bishop referred to African-Americans as "niggers."  (Id. ¶ 14.)  In addition, Berry testified that Bishop encouraged him to withhold his complaints of discrimination at the MCSD.

42

(See Viola Moving Cert., Ex. 2, 10/8/02 Berry Dep., at 60:8-
64:1.)

This evidence raises a genuine issue of material fact
whether Mills and Bishop, through deliberate indifference or
affirmatively harassing acts, failed to act against racial
harassment.  Therefore, the Court denies summary judgment to
Mills and Bishop on all counts that contain NJLAD claims based on
race.  As stated above, however, the Court grants summary
judgment on these counts to defendants Rochford, Dempsey,
Kinnecom, Corrente, and Nowacki.

**E.   Lack of Effective Procedures or Policies**

Counts four and nine of the complaint rest on Berry's
allegations that Defendants failed to establish or adopt
effective procedures to combat racial discrimination.  (Compl. ¶¶
58, 85.)  Berry, however, does not point to any law the
Defendants have violated with their alleged failure.  It appears
that Berry is attempting to construct a legal claim by refuting a
potential affirmative defense to a hostile work environment
claim, namely "(a) that the employer exercised reasonable care to
prevent and correct promptly any [racially] harassing behavior,
and (b) that the plaintiff employee unreasonably failed to take
advantage of any preventive or corrective opportunities provided
by the employer or to avoid harm otherwise." Burlington Indus.
v. Ellerth, 524 U.S. 742, 765 (1998).  Because the Court knows of

43

no law that imposes liability on an employer for failing to establish procedures or policies to combat racial discrimination, Berry has failed to state a claim upon which relief can be granted.  The Court therefore grants summary judgment to Defendants on count four and nine of the complaint.

**F.    § 1983 Equal Protection Claim**

Defendants move for summary judgment on count one, which alleges a violation of 42 U.S.C. § 1983; however, Defendants have failed to brief this issue for the Court.  Although inartfully pleaded, count one appears to allege that Berry was denied equal protection of the laws because Defendants discriminated against Berry on the basis of race.  In particular, "Defendants failed to effectively identify and remediate the racial discrimination/ harassment against" Berry.  (<u>See</u> Am. Compl. ¶ 45.)

A plaintiff may have a federal cause of action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Defendants are the MCSD and seven individual officers acting under their authority as Morris County personnel.

In order to establish a violation of his equal protection

44

rights, Berry must prove that Defendants acted with a racially discriminatory purpose.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977); Washington v. Davis, 426 U.S. 229, 245 (1976).  Viewed in its totality, the evidence submitted by Berry raises a genuine issue of material of fact as to whether Defendants intentionally discriminated against Berry on the basis of race.  Given the evidence submitted and the fact that Defendants failed to brief the § 1983 claim, the Court must deny summary judgment to Defendants on count one of the complaint.

**G.  Civil Conspiracy**

In count ten, Berry alleges various conspiracy theories culminating in his unlawful, pretextual termination.  Defendants have moved for summary judgment on count ten, claiming that Berry has offered no evidence of an agreement between Defendants to terminate Berry.  Berry has not opposed their motion on this issue.  For the following reasons, the Court finds that Berry has failed to demonstrate the existence of a civil conspiracy under either state or federal law.

**1.  New Jersey Civil Conspiracy**

Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a

45

wrong against or injury upon another, and an overt act that results in damage." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (citing Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)).

The Court agrees with Defendants that Berry has failed to present "a scintilla of evidence . . . suggesting the Defendants conspired to either discipline or terminate him for pre-textual reasons." (Def. Mot. for Summ. J. at 12.) None of the numerous depositions or affidavits even hint that Defendants formed an agreement to terminate Berry. Because there is no evidence of an agreement, Berry cannot prevail on his claim of state law civil conspiracy. The Court grants summary judgment inasmuch as count ten states a claim under state law.

### 2.   § 1985 Conspiracy

Although not stated explicitly, count ten also appears to set forth a claim under 42 U.S.C. § 1985. Under § 1985(3), a plaintiff may have a cause of action for a conspiracy to interfere with civil rights where "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or of equal privileges and immunities under the laws." In this case, Berry alleges that Defendants conspired to discipline and terminate him, which deprived him of his equal protection rights. (See Am. Compl. ¶¶

46

90-93.)  For the reasons below, the Court concludes that Defendants are entitled to summary judgment on count ten to the extent that it states a claim under § 1985(3).

First, the Court believes that Berry's complaint is founded primarily upon his Title VII claims.  In <u>Great American Federal Savings & Loan Association v. Novotny</u>, 442 U.S. 366, 372 (1972), the Supreme Court addressed whether an individual who was injured by a conspiracy to violate § 704(a) of Title VII was also deprived of equal protection of the laws within the meaning of 42 U.S.C. § 1985(3).  The Court held that, because § 1985(3) does not provide substantive rights itself, it "may not be invoked to redress violations of Title VII." <u>Id.</u> at 378.  Title VII provides its own remedial scheme, which cannot be circumvented by turning to the framework of § 1985(3).  <u>Id.</u> at 375-76.  Because Berry's cause of action under § 1985(3) appears to be premised on a deprivation of a right created by Title VII, it fails as a matter of law.  <u>See id.</u> at 378.

Second, as stated above, Berry has not shown that Defendants acted in concert to deny him equal protection of the laws. Without an agreement, there can be no civil conspiracy.

**H.   Intentional Infliction of Emotional Distress**

Count six alleges a claim for intentional infliction of emotional distress.  In order to state a claim for intentional infliction of emotional distress, "'plaintiff must establish

47

intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.'" <u>Taylor v. Metzger</u>, 152 N.J. 490, 509 (1998) (quoting <u>Buckley v. Trenton Sav. Fund Soc'y</u>, 111 N.J. 355, 366 (1988)).  The conduct must be so extreme and outrageous as to surpass all possible bounds of decency.  <u>Id.</u> (citations omitted).  "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not actionable.  <u>Id.</u> (citations and quotation marks omitted).

Defendants argue that the racial epithets and disparaging jokes heard by Berry do not rise to the requisite level of outrageousness and extreme behavior because Berry heard most of the comments secondhand.  The Court notes that New Jersey courts rightly deem racist slurs as offensive, intolerable, outrageous conduct, particularly in the employment setting.  <u>See id.</u> at 510-12.

Nonetheless, Berry fails to make out a claim for intentional infliction of emotional distress because he offers no proof of severe distress as a result of the alleged conduct by Defendants. "[T]he emotional distress suffered by the plaintiff must be 'so severe that no reasonable [person] could be expected to endure it.'" <u>Id.</u> at 514 (quoting <u>Buckley</u>, 111 N.J. at 366.)  In this case, the only evidence of distress is a medical report submitted by Defendants in which the doctor states Berry suffers from "a moderate degree of depression." (Viola Cert., Ex. 6, Johnson

Report, at 0000707.)  The doctor, however, concludes that the depression is the result of "pain and loss of function" due to Berry's back condition.  Id.  There is no indication that the depression stems from the conduct of Defendants.  A reasonable jury would not find that Berry suffered severe emotional distress as a result of Defendants' alleged conduct.  As a result, the Court grants summary judgment to Defendants on count six.

**I.    Claims Premised on Freedom of Speech and Association**

In count thirteen, Berry claims that Defendants retaliated against him for his cooperation and friendship with other minority officers, in violation of his rights to freedom of speech and freedom of association.  Count fourteen states a claim for violation of the New Jersey Constitution based upon the same conduct.  Defendants move for summary judgment on these two counts; once again, Berry provides no response in opposition. Therefore, the Court will grant summary judgment "if appropriate."

Under 42 U.S.C. § 1983, a public employee may sue to enforce his First Amendment rights if

> (1) [he] spoke on a matter of public concern; (2) [his] interest in that field outweighs the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the adverse employment decision would not have occurred but for the speech.

Forgarty v. Boles, 121 F.3d 886, 888 (3d Cir. 1997).  With respect to causation, "the plaintiff has the initial burden of

49

showing that his constitutionally protected conduct was a
'substantial' or 'motivating factor' in the relevant decision."
Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (citing Mount
Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287
(1977)).  These same standards apply to the free speech claim
premised on the New Jersey Constitution.  Because the protections
of Article I ¶ 6 of the New Jersey Constitution mirror those of
the First Amendment, the New Jersey Supreme Court relies on
federal constitutional principles in interpreting the free speech
provisions of the state constitution.  See Sunkett v. Misci, 183
F. Supp. 2d 692, 708 (D.N.J. 2002) (citing Hamilton Amusement
Ctr. v. Verniero, 156 N.J. 254, 264-65, 716 A.2d 1137, 1141-42
(1998)).

    Berry has not demonstrated that his association with other
minority officers or his testimony in other lawsuits against
these Defendants played a "substantial" or "motivating role" in
his termination.  There is no evidence in the record, direct or
circumstantial, of an adverse employment action taken against
Berry because he befriended and cooperated with other minorities.
In fact, the record surrounding Berry's termination is replete
with references to his back injury, not his associations with
other officers.  Consequently, Berry cannot prevail on his claims
under the First Amendment or the New Jersey Constitution.
Therefore, the Court grants summary judgment to Defendants on

counts thirteen and fourteen.

## IV. Miscellaneous Claims

### A.   HIPAA

In Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Berry raises for the first time a claim that Defendants violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  (Pl. Opp. Br. at 37.) Berry claims that the MCSD violated his right to confidentiality of his medical records when Del Vecchio contacted Dr. Giordano for an opinion as to Berry's ability to perform his job.

While the Court is not certain that HIPAA even allows for a private right of action against an employer for taking such action, the Court need not make this determination because Berry cannot raise a new claim in an opposition brief.  The Court therefore denies relief under HIPAA.

### B.   CEPA

Citing to Berry's original complaint, Defendants state that Berry seeks relief under the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 et seq.  (Def. Mot. for Summ. J. at 24.)  Berry's Amended Complaint, however, contains no cause of action or claim for relief under CEPA.  Therefore, to the extent that Berry now seeks relief under CEPA, the Court denies his request.

## V.    Limiting Damages

Defendants argue that Berry should be judicially estopped from recovering money damages in excess of $50,000.00 due to (1) his filing of a Chapter 13 bankruptcy petition estimating his assets at between $0.00 and $50,000.00, and (2) his alleged failure to file schedules or any other document disclosing the existence of the claims in this litigation.  Berry counters that he did include a reference to the pending litigation in his bankruptcy filing and his statement of assets.

The Court need not address this dispute.  On January 20, 2005, Judge Donald H. Steckroth of the United States Bankruptcy Court for the District of New Jersey issued an order dismissing Berry's bankruptcy action.  (Pl. Supp. Ltr. Br. of 3/31/05, Ex. C.)  Judge Steckroth's dismissal order renders moot any issues in this case relating to Berry's bankruptcy.  Therefore, the Court denies Defendants' request to limit Berry's damages to $50,000.00.

## VI.  Motions *In Limine*

Before the Court are three motions *in limine*: (1) Berry's motion to preclude evidence relating to his Workers' Compensation case; (2) Defendants' motion to preclude evidence of damages between December 1998 and July 15, 2002; and (3) Defendants' motion to prelude all evidence of race discrimination.

52

**A.   Evidence of Workers' Compensation Case**

Berry seeks to bar any evidence relating to his allegedly inconsistent testimony at his Workers' Compensation case.  In addition, Defendants' seek to preclude any evidence of damages during the time period Berry litigated his Workers' Compensation case.  The Court denies both motions.

As stated above, the Supreme Court requires an ADA plaintiff to explain the facial inconsistencies between his ADA claims and his claims for disability benefits.  Cleveland, 526 U.S. at 798. Therefore, Defendants must be allowed to present to the jury evidence that suggests Berry made inconsistent claims.  Berry, on the other hand, must persuade the jury that his claims were not inconsistent.  As Berry concedes, "neither party should be able to arrange any evidentiary preclusions or limitations."  (Pl. Br. in Opp. to Def. *In Limine* Mots. at 39.)

Furthermore, the Court will not limit Berry's evidence of damages to those damages he incurred after July 15, 2002. Disability benefits and relief pursuant to the ADA are not mutually exclusive.  Cleveland, 526 U.S. at 802-03.  Therefore, Berry has the right to present evidence of damages he incurred during the time he litigated his Workers' Compensation case - i.e. from December 1998 to July 15, 2002.

**B.   Evidence of Race Discrimination**

Pursuant to Federal Rules of Evidence 401 and 402, or

alternatively Rule 403, Defendants seek to preclude testimony regarding any evidence of racial discrimination during Berry's employment.  This motion has no merit.

The Court has concluded that many of Berry's claims for race discrimination under Title VII and the NJLAD will proceed to trial.  Certainly, evidence of race discrimination during his employment is relevant, admissible evidence pursuant to Federal Rules of Evidence 401 and 402.

Furthermore, the Court will not exclude the evidence pursuant to Federal Rule of Evidence 403.  The probative value of evidence of race discrimination is not "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.  To exclude the evidence would be to preclude Berry from proceeding on his claims of race discrimination, tantamount to granting summary judgment.  The Court therefore denies Defendants' motion to bar any evidence of race discrimination during Berry' employment.

**CONCLUSION**

For the foregoing reasons, the Court **denies** Berry's motion for partial summary judgment as to liability only on his claims for disability discrimination.

With respect to Defendant MCSD, the Court **grants** summary judgment to the MCSD on claims alleging pattern and practice discrimination (Count Two), failure to establish procedures to

54

combat discrimination (Counts Four and Nine), intentional infliction of emotional distress (Count Six), civil conspiracy (Count Ten), violations of the First Amendment (Count Thirteen), violations of the New Jersey Constitution (Count Fourteen), breach of contract (Count Fifteen), and breach of the implied warranties of good faith and fair dealing (Count Sixteen).  The Court **denies** summary judgment to the MCSD on claims alleging violations of Berry's civil rights (Count One), Title VII (Counts Three, Eight, Eleven, Twelve, Nineteen), NJLAD (Counts Three, Five, Eleven, Twelve, Seventeen, Eighteen, Nineteen), the ADA (Counts Seven, Seventeen, Eighteen), and the Rehabilitation Act (Seventeen, Eighteen).

With respect to the individual liability of Defendants Rochford, Dempsey, Kinnecom, Corrente, and Nowacki, the Court **denies** summary judgment to these individuals on Berry's claims alleging civil rights violations (Count One) and **grants** summary judgment on all other counts.

With respect to the individual liability of Defendants Mills and Bishop, the Court **denies** summary judgment on Berry's claims alleging violations of his civil rights (Count One) and the NJLAD (Counts Three, Eight, Eleven, Twelve, Nineteen).  The Court **grants** summary judgment to Mills and Bishop on all other counts.

Finally, the Court **denies** Berry's motion *in limine* and **denies** both of Defendants' motions *in limine*.

An appropriate Order follows.


                              /s/ William G. Bassler
                              WILLIAM G. BASSLER, U.S.S.D.J.

Dated: October 13, 2005